UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | |
|---|---|
| MICHAEL ANDREW SCUTERI, | ) |
| Plaintiff, | ) ) ) |
| v. | ) No. 2:23-cv-00103-MJD-JMS ) |
| PABLO PEREZ Dr., et al., | ) ) |
| Defendants. | ) ) |

**ORDER**

Michael Andrew Scuteri, an inmate of the Indiana Department of Correction ("IDOC"), is incarcerated at the Putnamville Correctional Facility in Greencastle, Indiana ("Putnamville"). [Dkt. 38; Dkt. 40.] He is proceeding *pro se* in this matter on two Eight Amendment claims of deliberate indifference to a serious medical need. [Dkt. 29.] The issue now before the Court for resolution is the affirmative defense of failure to exhaust administrative remedies.

**I. Background**

Mr. Scuteri filed his initial complaint on March 8, 2023, [Dkt. 1], which he amended on April 4, 2023, [Dkt. 12]. Mr. Scuteri claims that on May 7, 2021, he was severely injured when he drove his vehicle into a wall at sixty-five to seventy miles per hour. [Dkt. 30 at 2.] Mr. Scuteri was incarcerated following the crash and has remained so ever since. The claimed injuries include fractures to and the narrowing and bulging of multiple vertebrae. *Id.* Despite this, Mr. Scuteri claims that he never received "proper medical treatment or rehabilitation" for his injuries, was refused the use of his back and neck braces, was unable to acquire the prescribed dosage of

pain medication,[1] was refused accommodations and "Medical Lay-In" status, and was required to work a physical job. [Dkt. 30 at 3.]

The Court screened the amended complaint and dismissed all claims except Mr. Scuteri's claim for "injunctive relief against Centurion to ensure proper medical care for Mr. Scuteri's back and spine injuries consistent with the requirements of the Eighth Amendment." [Dkt. 17 at 3-5.] Mr. Scuteri moved to amend his complaint a second time on June 29, 2023, seeking to add damages claims against Centurion employees, IDOC employees, and other defendants. [Dkt. 28.] The Court screened the second amended complaint and Mr. Scuteri is now proceeding under the following claims:

1. An Eighth Amendment claim for deliberate indifference to a serious medical need against Centurion Health Services, LLC (injunctive and declaratory relief only); and

2. Eighth Amendment claims for deliberate indifference to a serious medical need against Dr. Pablo Perez and Unit Team Member Jade Reedy, in their individual capacities (compensatory and punitive damages).

[Dkt. 29.]

Initially, each Defendant asserted the affirmative defense that Mr. Scuteri failed to exhaust his administrative remedies prior to filing this lawsuit as required by the Prison Litigation Reform Act. As this defense must be resolved before reaching the merits of this case, see *Pavey v. Conley*, 544 F.3d 739, 742 (7th Cir. 2008), and *Perez v. Wis. Dep't of Corr.*, 182 F.3d 532, 536 (7th Cir. 1999), the Court issued an Entry Directing Development of Exhaustion Defense and Issuing Partial Stay on October 11, 2023, [Dkt. 41].

---

[1] The Court granted a preliminary injunction with respect to this concern on January 13, 2025, requiring Defendants Centurion and Perez to provide Plaintiff with 500mg of Tylenol three times per day. [Dkt. 140.]

On August 2, 2024, the Court denied Defendant Reedy's motion for summary judgment, [Dkt. 45], and notified Defendant Reedy of the Court's intention to grant summary judgment in Mr. Scuteri's favor. [Dkt. 82.] Defendant Reedy withdrew his exhaustion defense on August 8, 2024, [Dkt. 86]. In the same Order, the Court denied Defendants Centurion and Dr. Perez's motion for summary judgment, [Dkt. 51], and gave those parties (hereinafter referred to as "Defendants") seven days to either request a *Pavey* hearing or withdraw their exhaustion defense. [Dkt. 82.]

On Defendants' motion, [Dkt. 84], the Court granted leave to depose Mr. Scuteri and ordered Defendants to withdraw their exhaustion defense or request a *Pavey* hearing within three business days of the deposition. [Dkt. 85.] Defendants notified the Court that they wished to proceed with a hearing in this matter pursuant to *Pavey v. Conley* on September 10, 2024, [Dkt. 96]. The *Pavey* hearing was held on February 14, 2025, and the Court took the matter under advisement. [Dkt. 151.] For the reasons set forth below, the Court finds that Defendants have failed to prove that Mr. Scuteri did not exhaust the administrative remedies available to him.

## II. Applicable Law

The Prison Litigation Reform Act ("PLRA") requires a prisoner to exhaust his available administrative remedies before bringing a suit concerning prison conditions. 42 U.S.C. § 1997e(a); *Porter v. Nussle*, 534 U.S. 516, 524-25 (2002). The statutory exhaustion requirement is that "[n]o action shall be brought with respect to prison conditions . . . by a prisoner . . . until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter*, 534 U.S. at 532.

"To exhaust administrative remedies, a prisoner must comply strictly with the prison's administrative rules by filing grievances and appeals as the rules dictate." *Reid v. Balota*, 962 F.3d 325, 329 (7th Cir. 2020) (citing *Woodford v. Ngo*, 548 U.S. 81, 90-91 (2006)). A "prisoner must submit inmate complaints and appeals 'in the place, and at the time, the prison's administrative rules require.'" *Dale v. Lappin*, 376 F.3d 652, 655 (7th Cir. 2004) (quoting *Pozo v. McCaughtry*, 286 F.3d 1022, 1025 (7th Cir. 2002)). While the exhaustion requirement is strict, it "hinges on the availability of administrative remedies: An inmate, that is, must exhaust available remedies, but need not exhaust unavailable ones." *Ross v. Blake*, 578 U.S. 632, 642 (2016) (internal quotation omitted). "[T]he ordinary meaning of the word 'available' is 'capable of use for the accomplishment of a purpose,' and that which 'is accessible or may be obtained.'" *Id.*

The Supreme Court recognizes at least three circumstances where an administrative remedy is "not capable of use" and is thus unavailable: (1) where "it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates," *Ross*, 578 U.S. at 643; (2) where the "administrative scheme" is "so opaque" as to be practically "incapable of use," *id.*; and (3) where "administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 644. Thus, for example, "exhaustion is not required when the prison officials responsible for providing grievance forms refuse to give a prisoner the forms necessary to file an administrative grievance." *Hill v. Snyder*, 817 F.3d 1037, 1041 (7th Cir. 2016). "[A]n inmate is required to exhaust those, but only those, grievance procedures that are capable of use to obtain some relief for the action complained of." *Thomas v. Reese*, 787 F.3d 845, 847 (7th Cir. 2015) (internal quotation omitted). "Because exhaustion is an affirmative defense," Defendants face the burden

of establishing that "an administrative remedy was available and that [Mr. Scuteri] failed to pursue it." *Id.*

### III. Evidence of Record

#### A. The IDOC Grievance Policy

The IDOC utilizes a standardized Offender Grievance Policy that was in place during the time Mr. Scuteri alleges his rights were violated. Putnamville employed an inmate grievance procedure through the IDOC's Policy and Administrative Procedure No. 00-02-301, which has been in effect since September 1, 2020 (the "Grievance Policy"). Dkt. 51-1. The purpose of the Grievance Policy "is to provide a process where offenders committed to the Indiana Department of Correction may resolve concerns and complaints relating to the conditions of their confinement." *Id.* at 1. Moreover, the "process is to provide a mechanism for every offender to express complaints and topics of concern for the efficient and fair resolution of legitimate offender concerns and for facility and Department management to be better informed and better able to fulfill the Department's missions and goals." *Id.* at 1.

The Grievance Policy "is the only administrative remedy officially recognized by the Department for the resolution of offenders' grievable issues." *Id.* at 3. The Grievance Policy allows inmates to submit grievances on matters including policies, procedures, and rules of the IDOC or subject facility, including concerns relating to the conditions of the inmate's care or supervision. *Id.* at 3. All inmates, including Mr. Scuteri, are told about the Grievance Policy during their initial orientation at Putnamville. *Id.* at 7-8. The IDOC's policy requires it to keep records of the formal grievances and formal appeals filed by an inmate. *See* [Dkt. 51-2.]

The Grievance Policy process consists of three steps: (1) "[a] formal attempt to solve a problem or concern following unsuccessful attempts at informal resolutions;" (2) "[a] written

appeal to the Warden/designee; and" (3) "[a] written appeal to the Department Grievance Manager." [Dkt. 51-1 at 3]. An inmate who wishes to submit a grievance must submit a completed State Form 45471 "Offender Grievance" document to the grievance specialist no later than ten business days from the date of the subject incident or concern. *Id.* at 9-10. The grievance specialist then has ten business days to either accept the grievance or reject it using a State Form 47475 "Return of Grievance" document. *Id.* at 10. If the offender receives a Return of Grievance, he has five business days from the date of the Return of Grievance to return a revised Offender Grievance form. *Id.*

The grievance specialist has fifteen business days from the date the grievance is recorded to complete an investigation and provide a response to the inmate. *Id.* Within one business day after recording a completed Offender Grievance, the grievance specialist must submit the Offender Grievance to the appropriate facility staff or supervisor for a response, with a copy forwarded to the respective Quality Assurance Managers for medical grievances. *Id.* at 11. Within ten business days of an inmate's medical grievance, the facility staff or supervisor must investigate the grievance and prepare a written response that is forwarded to the Quality Assurance Manager for verification and approval. *Id.*

If the inmate receives no grievance response within twenty business days of the grievance specialist's receipt of the grievance, the inmate may appeal as if the grievance had been denied by the grievance specialist. *Id.* at 12. If an inmate is dissatisfied with the response to their Offender Grievance, he may appeal the response by completing the appropriate sections of State Form 45473 "Offender Grievance Appeal" within five business days after the inmate receives the grievance response. *Id.* The Warden or designee must then respond to the grievance appeal within ten business days of receiving it. *Id.* at 12-13. If the inmate continues to be dissatisfied

with the response to the grievance appeal, or if no response is timely received, he may appeal to the IDOC Grievance Manager with a completed State Form 45473 "Offender Grievance Appeal" within five business days after receiving the Warden or designee's appeal response. *Id.* The IDOC Offender Grievance Manager then has ten business days to complete its investigation and to submit a response. *Id.* at 13. The decision of the IDOC Offender Grievance Manager is final. *Id.* Completion of the appeals process outlined in the Grievance Policy is required in order to exhaust the grievance procedure.

### B. Putnamville's Implementation of the Grievance Policy

When Mr. Scuteri was first incarcerated at Putnamville, the IDOC's Grievance Policy was managed through a paper filing system. Inmates would submit their State Form 45471 "Offender Grievance" into one of several grievance boxes and wait for a "Return of Grievance" form indicating whether the grievance was accepted or rejected. The "Return of Grievance" form would be copied to the inmate's individual packet in Putnamville's records department. Inmates could access their records by submitting a request to the records department.

In early 2023, Putnamville switched to the Delta file management system. The Delta system still required inmates to submit physical grievance forms into the grievance boxes, but additionally required Putnamville's Grievance Specialist to electronically enter the grievances and communicate via email with prison staff. Grievance forms were made available to inmates in Putnamville's law library and its dormitory caseworkers' offices. They could also be provided to an inmate after making a request to the grievance office. Prior to the Delta system, the only record of an inmate's denied grievances would be found in their individual packet.

In order for an inmate to have the decision regarding their grievance reviewed, they need to fill out an "Offender Grievance Appeal." The appeal form requires a grievance case number,

which is assigned to a grievance at the time it is entered into the Delta system by the Grievance Specialist. The appeal form could only be obtained by contacting the grievance office with the case number, and it was an offense for an inmate to have a copy of the appeals form without a number on it.

Starting in December 2022, Donna Bumgardner was the Grievance Specialist at Putnamville. Ms. Bumgardner testified that the Delta system had issues and was an obstacle, that she was "overwhelmed" by the job, and that it was too much work for one person. When Ms. Bumgardner stepped down from her role as Grievance Specialist in November 2023, there was a substantial backlog of grievances.[2] This backlog required Ms. Bumgardner's two successors to cancel all outstanding grievances and require inmates to file new ones.[3] At the time this case was filed, there was still a backlog of approximately fifty grievances.

Michael Passmore, one of Putnamville's inmate shelter representatives, testified that at three separate representative meetings the inmates asked questions relating to the status of their grievances and expressed concerns that they were not being answered in a timely manner. These three meetings coincided with the time period leading up to and immediately following Ms. Bumgardner's departure. Mr. Passmore and Mr. Scuteri both testified that concerns with the grievance process were widespread across the entire prison population.

---

[2] Putnamville's Correctional Program Director II, Litigation Liaison, and Policy Manager, Heather Russell, testified that the backlog exceeded 100 grievances when Ms. Bumgardner left the Grievance Specialist position.

[3] On December 8, 2023, Mr. Scuteri received a letter from Putnamville's Administrative Assistant, Rita Pruiett. [Dkt. 136-25.] The letter explained:

> Because of an unforeseen backlog of grievances, your grievance was received on an "unknown date" causing it to be out of the time frame. Therefore, you were not given a timely response and according to the Grievance Policy AP 00-02-301, an appeal was not yet submitted. If this is a current grievance, please **resubmit a new grievance** for a timely response and remedy.

*Id.* (emphasis in original).

## C. Mr. Scuteri's Attempts at Exhaustion

Mr. Scuteri is familiar with the IDOC's Grievance Policy, having filed no less than thirteen documented grievances before filing this lawsuit on March 8, 2023.[4] *See* [Dkt. 51-2.] Of those grievances recorded in Putnamville's database before the filing of the complaint, only one concerned medical treatment. *See id.* That grievance does not mention Mr. Scuteri's spinal injuries, but rather conveys a general refusal of medical treatment. [Dkt. 51-3, Dkt. 136-1.]

However, Mr. Scuteri testified that he submitted numerous other grievances concerning his need for medical assistance before bringing suit but did not receive a response. In support of this testimony, Mr. Scuteri submitted copies of three completed grievance forms. [Dkt. 136-17.] The first requests medical treatment for a "broken" back and neck and a classification change to "Idle."[5] *Id.* at 6. The second again requests medical treatment for these conditions. *Id.* at 7. The third, in colorful terms,[6] reiterates Mr. Scuteri's requests for medical treatment. *Id.* at 10. Mr. Scuteri filed each of these three grievances in Putnamville's Prisoner Dining Room ("PDR") on January 13, 2022, January 23, 2022, and February 6, 2022, respectively. Mr. Scuteri further testified that he submitted as many as two grievances per month concerning medical treatment which he did not receive a response to. Moreover, Mr. Scuteri testified that he received no responses for any of the grievances he attempted to submit during the approximately three months that he was in solitary confinement.

---

[4] Docket No. 51-2 shows which grievances had been logged in Putnamville's Delta system. As is later explained, Mr. Scuteri attempted to submit many more than thirteen grievances before bringing this suit.
[5] Mr. Scuteri testified that since he could not grieve his classification, he had to request a classification change from Mr. Reedy. Mr. Reedy informed Mr. Scuteri that he would keep Mr. Scuteri on the job line unless Putnamville's medical staff put him on medical lay-in status.
[6] Ms. Russell testified that a grievance is not rejected solely because an inmate uses foul language, but inmates are expected to use appropriate and respectful language when drafting grievances. While this grievance may have been denied for its generous use of profanity, Mr. Scuteri never received notice of any decision.

Mr. Scuteri testified that, all-in-all, he had over 100 unanswered grievances. Ms. Bumgardner was responsible for 80 of them. Mr. Scuteri further testified that he had sent outside mail to the American Civil Liberties Union, the Indiana Ombudsman Bureau, the Indiana Attorney General's Office, Putnamville's Warden, and other offices in an effort to obtain relief. Mr. Scuteri attempted to appeal a grievance by marking "disagree" on a "Return of Grievance" form, but never received an appeal form. [Dkt. 136-11.] Mr. Scuteri also attempted to reach out to the appeals office, but to no avail.

Mr. Scuteri presented copies of four additional grievances at the *Pavey* hearing. [Dkt. 136-27 at 9-12.] While each of these grievances were dated after the filing of this lawsuit, the fact that they were not processed is relevant to the exhaustion issue. It is unclear how many of the grievances Ms. Bumgardner saw, but she wrote an email to Heather Russell acknowledging the contents of one. Despite having received the grievance, Ms. Bumgardner did not process it. Ms. Bumgardner testified that since the grievance concerned her own conduct, she could not process it herself. While that may be true, there is no evidence that the grievance was ever processed by anyone, nor is there any evidence that the other grievances—including one submitted on the same date—were processed. [Dkt. 136-27 at 11.]

**IV. Findings**

At the *Pavey* hearing, Defendants argued that Mr. Scuteri failed to exhaust the administrative remedies available to him because he failed to properly grieve the complaints at issue in this suit. The only medical grievance Mr. Scuteri submitted before the filing of the complaint in this case, Defendants contended, had nothing to do with Mr. Scuteri's back pain or his classification status. However, the fact that the Delta system only shows that one medical grievance was filed by Mr. Scuteri before he brought this suit is not controlling evidence. Rather,

the preponderance of the evidence demonstrates that the grievance system at Putnamville was not affording relief to inmates, particularly around the time this lawsuit was filed.

Mr. Scuteri demonstrated that he knew how to, and indeed did, comply with Putnamville's "administrative rules by filing grievances and appeals as the rules dictate." *Reid*, 962 F.3d at 329 (citing *Woodford v. Ngo*, 548 U.S. 81, 90-91 (2006)). Indeed, Mr. Scuteri's knowledge of the Grievance Policy extended to the Policy's appeal process and Putnamville's restriction on inmates possessing appeal forms. The Court credits Mr. Scuteri's testimony that he made consistent and numerous attempts at filing grievances and spoke with Ms. Bumgardner in an attempt to resolve his concerns with Putnamville's handling of his grievances. Mr. Scuteri asked Ms. Bumgardner at the *Pavey* hearing what he was supposed to do if he submitted a grievance and got no response. Ms. Bumgardner responded that he would have the option of speaking to his caseworker, reaching out to the grievance officer, or filing another grievance. In other words, Mr. Scuteri's only relief at Putnamville was to do what he had been doing: filing grievance after grievance and doing his best to convince prison officials to hear him out. The process at Putnamville, then, "operate[d] as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates," *Ross*, 578 U.S. at 643.

It was Defendants' burden to disprove Mr. Scuteri's testimony; this they simply did not do. All Defendants offered to contradict Mr. Scuteri's testimony was the testimony of Ms. Russell and Ms. Bumgardner. At times during her testimony, Ms. Bumgardner stated there was not a substantial buildup of grievances. This testimony was not only contradicted by Ms. Russell's testimony, but to a degree by Ms. Bumgardner herself when she acknowledged that two people were needed to clear the backlog of grievances when she stepped down from her role as grievance specialist. There was in fact a significant backlog of unprocessed grievances. Indeed,

there were so many outstanding grievances that the officials at Putnamville deemed it necessary to take a mulligan and cancel them all. [Dkt. 136-25.] Defendants tried to establish that there was a functioning grievance system by admitting evidence of those occasions where the Grievance Policy at Putnamville resulted in the complete processing of grievances. However, these few examples simply cannot outweigh the vast number of times where the process evidently failed to provide relief.

Ultimately, "an inmate is required to exhaust those, but only those, grievance procedures that are capable of use to obtain some relief for the action complained of." *Thomas*, 787 F.3d at 847 (internal quotation omitted). The evidence before the Court shows that the grievance procedures at Putnamville broke down and was not available to Mr. Scuteri in any meaningful way. Defendants therefore have failed to prove their affirmative defense that Mr. Scuteri failed to exhaust the administrative remedies available to him.

## V. Mr. Scuteri's Motion to Submit Additional Exhibits

Mr. Scuteri filed a Motion to Submit Additional Exhibits on January 21, 2025. [Dkt. 144.] In it, Mr. Scuteri sought to have three additional exhibits considered at the *Pavey* hearing: the Declarations of Michael Passmore and Joseph Hartsock and a Motion to Strike Declaration of Tricia Pretorious. Each exhibit was addressed at the hearing: hearsay objections to the Declarations of Michael Passmore and Joseph Hartsock were sustained, and the Motion to Strike Declaration of Tricia Pretorious was withdrawn. Accordingly, Mr. Scuteri's Motion to Submit Additional Exhibits, [Dkt. 144], is **DENIED AS MOOT**.

## VI. Conclusion

For the reasons set forth above, the Court finds that Defendants have failed to prove their affirmative defense of failure to exhaust administrative remedies available to him. Accordingly, this case shall proceed against all Defendants.

Mr. Scuteri's Motion to Submit Additional Exhibits, [Dkt. 144], is **DENIED AS MOOT**.

SO ORDERED.

Dated: 28 MAR 2025

_____
Mark J. Dinsmore
United States Magistrate Judge
Southern District of Indiana

Distribution:

Service will be made electronically on all ECF-registered counsel of record via email generated by the Court's ECF system

Michael Andrew Scuteri
286882
Putnamville Correctional Facility
Electronic Service Participant – Court Only